UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:20-CV-00809-GNS-CHL


ROY STUCKER; and
COURTNEY BROWN-PORTER
on behalf of herself and her minor child, S.W.                                        PLAINTIFFS

v.

LOUISVILLE METRO GOVERNMENT; and
UNKNOWN METRO POLICE OFFICERS                                               DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 29). The motion is ripe for adjudication. For the outlined reasons, Defendants' motion is **GRANTED**.

## I.      SUMMARY OF THE FACTS

This action was initiated in Jefferson Circuit Court, Kentucky, by Plaintiffs Roy Stucker ("Stucker") and Courtney Brown-Porter ("Brown-Porter"), on behalf of herself and her minor child ("S.W.") (collectively "Plaintiffs"), alleging violations of their constitutional rights and state laws. (Compl. 4-7, DN 1-3). Plaintiffs named Louisville Metro Government ("LMG"), "Unknown Detective," and "Unknown Metro Police Officers" ("Unknown Officers") as Defendants. (Compl. 1). An Amended Complaint was subsequently filed, substituting Wesley Troutman ("Troutman") for "Unknown Detective." (Am. Compl. 1, DN 1-3). LMG timely removed the action to federal court. (Notice Removal, DN 1).

This matter is premised upon the execution of a search warrant in July 2019, in Jefferson County, Kentucky. (Am. Compl. ¶¶ 3, 5, 7). The warrant was related to suspected drug activity by Joshua Kirk ("Kirk"), who was surveilled multiple times and seen previously entering a

residence on West Amherst Avenue in Louisville, Kentucky ("the Residence").  (Am. Compl. ¶¶ 7-9).  Plaintiffs allege the Residence had been vacant for several days at the time of the search, and anyone affiliated with Kirk or drug activity no longer remained.[1]  (Am. Compl. ¶¶ 12, 14-15).  Stucker was hired to paint the Residence for new tenants, and Plaintiffs were inside when the warrant was executed.  (Am. Compl. ¶¶ 5, 7, 13, 16).  Plaintiffs allege a SWAT team stormed inside with no warning and weapons drawn, and all of the Plaintiffs, including S.W., were handcuffed.  (Am. Compl. ¶¶ 17-19, 22).

The Court previously granted Troutman's motion to dismiss the claims against him.  (Mem. Op. & Order, DN 16).  The remaining claims are:  Count II against the Unknown Officers for illegal search and seizure; Count III against LMG, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for a policy or custom served to deprive Plaintiffs of their rights and failure to properly train its officers; and Count IV asserting state law claims against the Unknown Officers.  (*See* Am. Compl. ¶¶ 42-51, 52-63, 64-73).  LMG now moves for entry of judgment in its favor as to the remaining claims against it and the Unknown Officers.  (Defs.' Mot. Summ. J., DN 29).

## II.    **JURISDICTION**

The Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction.  *See* 28 U.S.C. § 1331.  Supplemental jurisdiction exists over the state law claims.

---

[1] LMG avers that Kirk was arrested on July 15, 2019, just prior to the execution of the search warrant.  (Defs.' Mem. Supp. Mot. Summ. J. 2, DN 29-1).  During his deposition, Troutman recounted that Kirk was arrested with over a pound of methamphetamine after fleeing from a "narcotics buy" site and, after his arrest, admitted to previously visiting the Residence to pick up narcotics.  (Troutman Dep. 23:23-24:7, Jan. 12, 2022, DN 29-3).  Troutman also signed an affidavit detailing the same information.  (Troutman Dep. Ex. 2, ¶ 4, DN 29-3).

*See* 28 U.S.C. § 1367(a).  Venue is proper in the Western District of Kentucky as the subject events all occurred in Louisville, Kentucky.  *See* 28 U.S.C. § 1391(b).

## III.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant establishes this lack of material fact, the burden shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence.  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).  If the record, taken as a whole, could not support a finding of fact in favor of the nonmoving party, the motion should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## IV.    DISCUSSION

LMG seeks summary judgment in its favor and in favor of the Unknown Officers.  (Defs.' Mem. Supp. Mot. Summ. J. 1, 16-23 DN 29-1 [hereinafter Defs.' Mem.]).  Plaintiffs' have filed a response in opposition to LMG's motion.  (Pls.' Resp. Defs.' Mot. Summ. J., DN 35 [hereinafter Pls.' Resp.]).  The Amended Complaint contains two counts against the Unknown Officers:  Count II, alleging illegal search and seizure under 42 U.S.C. § 1983; and Count IV, alleging official misconduct and tort claims under Kentucky law.  (*See* Am. Compl. ¶¶ 42-51, 64-73).  While LMG

raises several grounds for dismissal, Plaintiffs' response notes that "[t]he only claim remaining and/or being pursued in this case is Plaintiffs' *Monell* claim against [LMG]." (Pls.' Resp. 3). Accordingly, all other claims are conceded and will be dismissed. *See Cunningham v. Tenn. Cancer Specialists, PLLC*, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013) ("It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citation omitted)).

The claim against LMG seeks municipal liability for a failure to train and preservation of a policy or custom depriving citizens' rights. (Am. Compl. ¶¶ 52-63); *see Monell*, 436 U.S. 658. LMG asserts the claim is deficient and should be dismissed because the claims against Troutman were dismissed. (Defs.' Mem. 6-15). Plaintiffs aver their rights were violated, as the warrant lacked probable cause, and that LMG is liable due to its training policies and condoning of the acts. (Pls.' Resp. 4-9).

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible" but "only for its own wrongdoing, not the wrongdoings of its employees." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell*, 436 U.S. at 690; *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015)); *see also D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (finding a municipality cannot be liable "*solely* because it employs a tortfeasor." (internal quotation marks omitted) (quoting *Monell*, 436 U.S. at 691)). Thus, liability "attaches only under a narrow set of circumstances." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citation omitted). A *Monell* claim requires proof that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* (internal quotation marks omitted) (quoting *Alman v. Reed*, 703 F.3d 887, 903

(6th Cir. 2013)).  This is achieved by "showing that the municipality had a 'policy or custom' that caused the violation of his rights."  *Id.* (citing *Monell*, 436 U.S. at 694).  If no constitutional violation is established, however, the inquiry is unnecessary.  *Griffith v. Franklin Cnty.*, 975 F.3d 554, 581 (6th Cir. 2020); *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019).  A party bringing a *Monell* claim faces a "high bar," and it "is exceedingly rare" for the claim to survive summary judgment.  *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 541-42 (6th Cir. 2018).

Plaintiffs allege the procurement and execution of the warrant violated their rights under the Fourth Amendment.  (Am. Compl. ¶¶ 22-27, 34-40, 44-50, 53-62; Pls.' Resp. 4-9).  Specifically, "[e]ven the most basic due diligence would have revealed that there was no probable cause to issue and/or execute the search warrant" and the execution was "completely unreasonable . . . under the circumstances."  (Am. Compl. ¶¶ 37, 44).  Plaintiffs' response does not address reasonableness; instead, it discusses only the actions taken in obtaining the warrant and the associated policies.  (Pls.' Resp. 4-16).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967); *see also INS v. Delgado*, 466 U.S. 210, 215 (1984) ("The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'"  (citation omitted))

A.    **Obtaining the Warrant**

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)).  Warrants are only issued when based "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also Johnson v. United States*, 333 U.S. 10, 14 (1948) (observing that probable cause must "be drawn by a neutral and detached magistrate instead of being judged by the officer . . . ."); *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) ("Probable cause exists 'if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" (internal quotation marks omitted) (quoting *Peffer*, 880 F.3d at 263)).  "[A] determination of whether there was probable cause for a search which gave rise to a § 1983 action is a question to be determined by a jury unless there is only one reasonable determination." *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989) (citations omitted).  Hence, the Court must "evaluate for some minimal showing of credibility any evidence that the defendants did not have probable cause." *Yancey*, 876 F.2d at 1243 (internal quotation marks omitted) (citation omitted).

"[W]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Marvaso v. Sanchez*, 971 F.3d 599, 610 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)); *see United States v.*

*Leon*, 468 U.S. 897, 922-23 (1984).  This Circuit "pays great deference to the determinations of probable cause made by a state magistrate, whose findings 'should not be set aside unless arbitrarily exercised[,]'"[2] except for when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *United States v. Pelham*, 801 F.2d 875, 877-78 (6th Cir. 1986)); *Peffer*, 880 F.3d at 263 (internal quotation marks omitted) (quoting *Messerschmidt*, 565 U.S. at 547).

Troutman went before a state court judge to seek the subject search warrant, supported by his affidavit.  (Compl. Ex. B, DN 1-3 [hereinafter Warrant Aff.]).  Jefferson Circuit Court Judge Mary Shaw found probable cause from the material and issued the warrant.  (Compl. Ex. A, DN 1-3).  Troutman's affidavit was dated July 15, 2019, and described various aspects about the Residence in detail, in addition to attaching an exterior picture.  (Warrant Aff. 1).  The affidavit named Kirk as a person to be incidentally searched, recounting statements by a confidential informant ("CI") that Kirk[3] was involved in heroin and methamphetamine trafficking, as corroborated through surveillance and controlled narcotics purchases.  (Warrant Aff. 1, 3-8).  Additionally, five instances of surveillance are detailed in the affidavit, not including an investigative stop, as well as six controlled purchases occurring between May and July 2019 at several locations in Louisville.  (Warrant Aff. 3-8).

---

[2] The magistrate cannot "rubber stamp" the warrant and find probable cause without more than minimal inquiry into the affidavit.  *Leon*, 468 U.S. at 914.  Plaintiffs bear the burden of showing such misconduct, but Plaintiffs make no such contention.  *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 649 (6th Cir. 2003).

[3] Troutman's affidavit referred to reports by the CI of a person using the alias "Jay" while engaging in narcotics trafficking, but the CI did not know Jay's real name.  (Warrant Aff. 3).  After an investigative stop on May 17, 2019, "Jay" was identified as Kirk.  (Warrant Aff. 4).  Surveillance and controlled purchases confirmed "Jay" was Kirk.  (Warrant Aff. 3-4).

With respect to the Residence, the affidavit stated:

1.     During the week of June 7, 2019, Troutman utilized the CI to conduct a controlled purchase of heroin and methamphetamine from Kirk.  Prior to the CI contacting Kirk about the purchase, Kirk visited the Residence for "[a] short time" before leaving the area in the passenger seat of a second vehicle.  Thereafter, Kirk returned to the Residence before departing in his initial vehicle.  Following his departure, Kirk contacted the CI and provided a more detailed location to conduct the purchase.  Kirk arrived at the location with heroin and methamphetamine.

2.     During the week of June 25, 2019, Troutman utilized the CI to conduct a controlled purchase of methamphetamine from Kirk.  After Kirk and the CI communicated, Kirk was observed travelling to the Residence, where he walked towards it.  After a short period of time, Kirk walked away from the Residence and went to the purchase location, where a quantity of methamphetamine was sold.

(Warrant Aff. 5-6).  The affidavit recounted Kirk's criminal history, including one conviction and one pending case involving trafficking in controlled substances.  (Warrant Aff. 4).  Troutman indicated that the cumulative investigation summary, including Kirk travelling to and from the Residence "shortly before multiple controlled buys and activity indicative of narcotics trafficking," was sufficient to find probable cause, and the use of a search warrant at the Residence "w[ould] result in the seizure of illegal controlled substances" and related instrumentalities implicating Kirk. (Warrant Aff. 8-9).

"Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny[,]" and review "is limited to the information presented in the four corners of the affidavit." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004); *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)); *see also United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) ("When deciding whether [probable cause] exists, courts must view the totality of the circumstances through the common-sense lens of ordinary people, not the technical lens of trained lawyers." (citing *United States v. Christian*, 925 F.3d 305, 309-11 (6th Cir. 2019) (en banc))).  To obtain a warrant, probable

8

cause is not required "to believe evidence will *conclusively* establish a fact before permitting a search, but only 'probable cause . . . to believe that the evidence sought *will aid* in a particular apprehension or conviction.'" *Peffer*, 880 F.3d at 263 (internal quotation marks omitted) (quoting *Messerschmidt*, 565 U.S. at 552 n.7); *see Sheckles*, 996 F.3d at 337 ("Probable cause 'is not a high bar.' It demands only a 'fair probability' of criminal activity." (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018); *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc))). Sixth Circuit precedent "leave[s] no doubt that probable cause may exist if the evidence provided to a magistrate 'directly connect[s] the residence with the suspected drug dealing activity . . . .'" *United States v. Miller*, 850 F. App'x 370, 373 (6th Cir. 2021) (second and third alterations in original) (quoting *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016)).

In this instance, Troutman's affidavit detailed Kirk's visits to the Residence and its vicinity on two separate occasions temporally connected to narcotics sales. Considering the entire affidavit, including multiple controlled purchases and surveillance of uncontrolled purchases, and the great deference afforded to the probable cause determinations of state court judges, the facts and circumstances outlined in Troutman's affidavit would support a reasonably prudent belief that narcotics trafficking had occurred, and evidence of such activity would be found at the Residence. *See Tlapanco*, 969 F.3d at 648; *Weaver*, 99 F.3d at 1377. Thus, no constitutional violation occurred in the issuance of the warrant, subject to Plaintiffs' claims that the affidavit contained stale information.[4]

---

[4] Plaintiffs allege Troutman defied internal policies when preparing his affidavit, as a supervisor did not review it (or review was cursory if conducted) before submission, and he did not present any information regarding who owned or lived at the Residence. (Pls.' Resp. 7-8, 15 (citation omitted)). Regardless, internal procedure violations do not undermine a judge's probable cause finding. Moreover, "alleged failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation." *Mustin v. Guiller*, 563 F. Supp. 3d 715, 725 (N.D. Ohio 2021) (internal quotation marks omitted) (citation omitted); *see Griffith*, 975 F.3d at 582.

### B.      Staleness of Information

Plaintiffs next assert that Troutman's affidavit presented stale information connecting Kirk to the Residence.  (Pls.' Resp. 4-9; Am. Compl. ¶¶ 7-12).  Probable cause may not be found based upon stale information.  *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) ("The probable cause required for a search warrant 'is concerned with facts relating to a presently existing condition.'" (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998))).  "[A] warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location."  *Jackson*, 470 F.3d at 308 (alteration in original) (internal quotation marks omitted) (quoting *Abboud*, 438 F.3d at 572).  "The staleness inquiry is tailored to the specific circumstances in each case" and "depends on the 'inherent nature of the crime.'"  *Abboud*, 438 F.3d at 572 (citing *Spikes*, 158 F.3d at 923); *United States v. Young*, 847 F.3d 328, 347 (6th Cir. 2017) (quoting *Spikes*, 158 F.3d at 923).  Importantly, "[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate."  *United States v. Perry*, 864 F.3d 412, 415 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Spikes*, 158 F.3d at 923).

Staleness is analyzed through four factors:  "(1) whether the crime is transitory or continuing; (2) whether the criminal is nomadic or stationary; (3) whether the thing to be seized is perishable or durable; and (4) whether the place to be searched is a forum of convenience or a secure operational base."  *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015) (citing *Abboud*, 438 F.3d at 572-73); *see Jackson*, 470 F.3d at 308 (noting that a "court should consider the defendant's course of conduct, the nature and duration of the offense, the nature of the relevant evidence, and any corroboration of the information." (citing *United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir. 2006))).  "[W]here recent information corroborates otherwise stale information,

10

probable cause may be found." *Marcilis v. Redford Twp.*, 757 F. Supp. 2d 663, 676 (E.D. Mich. 2010) (internal quotation marks omitted) (citation omitted); *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness." (citing *United States v. Canan*, 48 F.3d 954, 958 (6th Cir. 1995))).

Plaintiffs note that "[i]n the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)). However, as explained by the Sixth Circuit:

> *Frechette* concerned a search warrant for child pornography that was based on an online purchase made 16 months earlier and linked to a specific street address. *Frechette*, 583 F.3d at 377. We reasoned that "child pornography is not a fleeting crime" and thus "the same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *Id.* at 378 (quoting *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009)). *We contrasted this with drug trafficking crimes, where evidence goes stale more quickly "in the absence of information indicating an ongoing and continuing narcotics operation."* *Id.* (quoting *United States v. Kennedy*, 427 F.3d 1136, 1142 (8th Cir. 2005)). When a criminal enterprise is ongoing at the same location, "the passage of time becomes less significant."

*Gardner v. Evans*, 920 F.3d 1038, 1047-48 (6th Cir. 2019) (emphasis added) (quoting *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

The first factor is viewed as whether the activity was a "chance encounter in the night or [a] regenerating conspiracy . . . ." *Abboud*, 438 F.3d at 572 (internal quotation marks omitted) (quoting *Spikes*, 158 F.3d at 923). The surveillance and controlled purchases reflect that Kirk was engaged in a "regenerating conspiracy." (Warrant Aff. 3-8); *see Young*, 847 F.3d at 347 ("First, the character of the crime, conspiracy to traffic narcotics, is not a chance encounter in the night. It is a regenerating conspiracy." (citing *Abboud*, 438 F.3d at 573; *Greene*, 250 F.3d at 481)); *United States v. Redmond*, 475 F. App'x 603, 608 (6th Cir. 2012) (finding extended drug schemes "allow

for greater lapses of time between the information relied upon and the request for a search warrant." (internal quotation marks omitted) (quoting *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010))). Thus, "the passage of time becomes less significant." *Gardner*, 920 F.3d at 1047-48 (internal quotation marks omitted) (quoting *Greene*, 250 F.3d at 481).

The warrant was executed on July 15, 2019, the same day Troutman signed the affidavit. (Warrant Aff. 10). The affidavit detailed surveillance from May through July 2019, and Kirk's drug sales as recent as two days before the affidavit. (Am. Compl. ¶ 7; Warrant Aff. 3-8). The most recent involvement with the Residence occurred the week of June 25, 2019, about three weeks before the affidavit was signed. (*See* Warrant Aff. 6). "[E]vidence of drug sales two to fifty-one days before [the probable cause determination] is recent enough here to suggest that there may be further evidence of illegality in that place." *Perry*, 864 F.3d at 415; *see Adams v. City of Clarksville*, No. 3:09-cv-220, 2010 U.S. Dist. LEXIS 155408, at *20-21 (M.D. Tenn. Sept. 21, 2010) ("The evidence relied upon in this case for issuance of the warrant was not stale, being merely several months old."). Therefore, this factor weighs against Plaintiffs. *See United States v. Ombisi*, No. 2:21-cr-20011-MSN-cgc, 2022 U.S. Dist. LEXIS 153979, at *13 (W.D. Tenn. Aug. 26, 2022) ("This factor is all but dispositive on the staleness issue . . . ." (citing *United States v. Rodriguez*, 716 F. App'x 387, 390 (6th Cir. 2017)).

Next, the affidavit details a litany of narcotics purchases, controlled and uncontrolled, conducted by Kirk throughout Louisville. (Warrant Aff. 3-8). This nomadic style of distribution, however, does not favor Plaintiffs, as Kirk was observed consistently returning to his home, albeit different from the Residence. (Warrant Aff. 3-8). The nature of those who lived in the Residence, whether they were nomadic or stationary, is unknown. The affidavit contained no such information. Given the lack of information, this factor favors Plaintiffs. *See Ricci v. DeStefano*,

12

557 U.S. 557, 586 (2009) ("On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))).

Third, while the act of trafficking drugs may provide some durability, the methamphetamine and heroin Kirk allegedly sold were clearly perishable items. *Ombisi*, 2022 U.S. Dist. LEXIS 153979, at *14 (citing *Redmond*, 475 F. App'x at 608-09; *Abboud*, 438 F.3d at 572); *see also United States v. Higginbotham*, No. 6:16-cr-00054-S-GFVT-HAI, 2017 U.S. Dist. LEXIS 83877, at *12 (E.D. Ky. June 1, 2017). Thus, this factor favors Plaintiffs.

The final factor considers whether the Residence was a secure operational base or a forum of convenience. The caselaw normally centers upon a defendant's home being searched, which "is clearly a 'secure operational base.'" *Christian*, 925 F.3d at 324 (Gilman, J., dissenting) (internal quotation marks omitted) (quoting *Frechette*, 583 F.3d at 379; *Powell*, 603 F. App'x at 478); *see also Greene*, 250 F.3d at 481; *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). Kirk did not live at the Residence but did visit the Residence including at least once immediately preceding a narcotics purchase. (Warrant Aff. 3-8). Additionally, the affidavit detailed at least one instance where Kirk interacted with another person engaged in drug trafficking. (Warrant Aff. 3-8). Moreover, the affidavit, taken as a whole, paints a picture of the Residence and its occupants being Kirk's associates apparently entwined in Kirk's trafficking.[5] *See Reed*, 993 F.3d at 448 (collecting cases where probable cause was found to search the home of narcotics dealers when

---

[5] Troutman explained that Kirk visited the Residence more than the two times listed in the affidavit and a tracker report in the investigative file details multiple incidents of Kirk travelling to the Residence. (Troutman Dep. 22:1-6). These other visits, however, were not included in the affidavit. (Troutman Dep. 22:3-23:22, 29:3-17). Review of the affidavit is limited to the "four corners" of the document, so the omitted visits are not considered. *See Jackson*, 470 F.3d at 306.

13

the police watched a suspect leave the home to conduct a buy and then return to the home). Ultimately, the fourth factor weighs against Plaintiffs.

"[W]here recent information corroborates otherwise stale information, probable cause may be found[,]" and "evidence of ongoing criminal activity will generally defeat a claim of staleness." *Marcilis*, 757 F. Supp. 2d at 676 (internal quotation marks omitted) (quoting *United States v. Henson*, 848 F.2d 1374, 1381-82 (6th Cir. 1988)). The Sixth Circuit has affirmed a probable cause finding when an affidavit included four-year-old conduct, but newer information demonstrated an "ongoing" nature which defeated a staleness claim. *Canan*, 48 F.3d at 958-59. Particularly, "although a significant period of time may have elapsed since a defendant's last reported criminal activity, it may be properly inferred that indicia of criminal activity will be kept for some period of time." *Id.* at 959 (citations omitted). Here, the detailed events indicated ongoing criminal activity, as recent as two days before the affidavit. (Warrant Aff. 3-8). This undermines a finding of staleness.

Ultimately, when balancing the factors, the information provided in Troutman's affidavit for the warrant was not stale. The affidavit described events that occurred within two and a half months of its execution, including Kirk's visit to the vicinity of the Residence apparently related to a controlled purchase only two days before the affidavit. (Warrant Aff. 3-8). As such, Judge Shaw was not provided stale information when considering the affidavit, and the information supplied sufficiently supported probable cause to issue the warrant. *See Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (emphasizing that "the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."); *Peffer*, 880 F.3d at 263 (stating that probable cause is not required "to believe evidence will *conclusively* establish a fact

14

before permitting a search, but only 'probable cause . . . to believe that the evidence sought *will aid* in a particular apprehension or conviction.'"   (internal quotation marks omitted) (quoting *Messerschmidt*, 565 U.S. at 552 n.7)).  This finding is the "only reasonable determination" a jury could reach.  *See Yancey*, 876 F.2d at 1243; *Peffer*, 880 F.3d at 263-64.  Therefore, no constitutional violation occurred in this regard.

### C.   Seizure of Plaintiffs

"A person is seized within the Fourth Amendment's meaning when an officer 'by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied.'"  *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)).  "The applicable inquiry is 'whether the challenged conduct objectively manifests an intent to restrain.'"  *Hopkins v. Nichols*, 37 F.4th 1110, 1115 (6th Cir. 2022) (emphasis omitted) (quoting *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021)); *see also Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime – 'arrests' in traditional terminology.  It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").  Ultimately, "forced compliance with orders is a Fourth Amendment seizure."  *Hopkins*, 37 F.4th at 1117.  A seizure "lasts only as long as the application of force."  *Torres*, 141 S. Ct. at 999.  When officers assemble outside a residence with weapons drawn, announce themselves, and demand the occupants to exit, this amounts to a seizure.  *Hopkins*, 37 F.4th at 1117 (discussing *United States v. Saari*, 272 F.3d 804, 808-09 (6th Cir. 2001)).  At all points, "an official seizure of the person must be supported by probable cause, even if no formal arrest is made."  *Michigan v. Summers*, 452 U.S. 692, 696 (1981) (citing *Dunaway v. New York*, 442 U.S. 200, 207 (1979)).

15

In this instance, Plaintiffs were inside the Residence when the warrant was executed. (Am. Compl. ¶¶ 5-6, 16-19). Officers pointed their weapons at Plaintiffs while yelling commands, and Plaintiffs were handcuffed. (Am. Compl. ¶¶ 19, 22). All these actions constitute a seizure of Plaintiffs. *See Hopkins*, 37 F.4th at 1115-17. This seizure, however, is "plainly permissible." *Muehler v. Mena*, 544 U.S. 93, 98 (2005). "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705 (footnotes omitted); *see id.* at 704-05 ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home."). This authority "is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). Moreover, this authority exists when the detention does not become an arrest and even extends to nonresidents present at the scene of the search. *United States v. Wagner*, 289 F. App'x 57, 59 (6th Cir. 2008); *Thornton v. Fray*, 429 F. App'x 504, 508 (6th Cir. 2011) (citation omitted)

Given no constitutional violation occurred when the search warrant was issued, the officers executing the warrant maintained limited authority to detain Plaintiffs while conducting the search. *See Delgado*, 466 U.S. at 215. Brown-Porter specifically recounted being told that the handcuffs were to make sure none of Plaintiffs were a threat to officers during the search. (Brown-Porter Dep. 20:23-21:2, Oct. 21, 2021, DN 29-6). Therefore, no constitutional violation occurred at this juncture.

### D.   **Execution of the Warrant**

In tandem with limited detention authority, a warrant includes "the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98-99 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Graham*, 490 U.S. at 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (citing *Terry*, 392 U.S. at 22-27)).   The inquiry focuses on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation[,]" with the analysis "requir[ing] a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (internal quotation marks omitted) (citations omitted); *see Baynes*, 799 F.3d at 608 (citing *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).   Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" and the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (citations omitted).   Plaintiffs do not address the reasonableness of the force used by the officers in effecting their detention, but instead focus on Troutman's actions in obtaining the search warrant.   (Pls.' Resp. 4-9).   Therefore, the Court will not further address the reasonableness of the execution of the warrant, as this has been waived. *See Cunningham*, 957 F. Supp. 2d at 921 (citation omitted).

E.    **LMG Policies & Customs**

Even if Plaintiffs had contested the reasonableness of the search at the Residence, a *Monell*

claim requires establishing that "through its deliberate conduct, the municipality was the 'moving

force' behind the injury alleged." *Jackson*, 925 F.3d at 828 (internal quotation marks omitted)

(quoting *Alman*, 703 F.3d at 903).   As LMG did not directly inflict the alleged injury, the claim

must be examined through "rigorous standards of culpability and causation . . . ." *Bd. of the Cnty.*

*Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997) (citations omitted).   To demonstrate

this "moving force," Plaintiffs must show a policy or custom[6] by the municipality which caused a

violation of constitutional rights under one of four approaches. *See Jackson*, 925 F.3d at 828.   To

satisfy one of these approaches, Plaintiffs "may prove '(1) the existence of an illegal official policy

or legislative enactment; (2) that an official with final decision making authority ratified illegal

actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of

a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v.*

*Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).   Plaintiffs focus on the third and fourth approaches.

(Pls.' Resp. 9-16).

In the relevant parts, Plaintiffs' Amended Complaint alleges LMG "fails to adequately train

its officers regarding executing search warrants in order to protect citizens' Fourth Amendment

rights to be protected from unreasonable searches and seizures . . . ."   (Am. Compl. ¶ 55).

---

[6] A "policy" is a "decision[] of [a municipality's] duly constituted legislative body or of those
officials whose acts may fairly be said to be those of the municipality." *Brown*, 520 U.S. at 403-
04 (citing *Monell*, 436 U.S. at 694).   "Similarly, an act performed pursuant to a 'custom' that has
not been formally approved by an appropriate decisionmaker may fairly subject a municipality to
liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*
at 404 (citing *Monell*, 436 U.S. at 690-91); *see also Doe v. Claiborne Cnty.*, 103 F.3d 495, 507
(6th Cir. 1996) ("A 'custom' for purposes of *Monell* liability must 'be so permanent and well
settled as to constitute a custom or usage with the full force of law' . . . [and] must reflect a course
of action deliberately chosen from among various alternatives."   (citations omitted)).

Moreover, LMG's "'actual' policy and custom regarding executing search warrants is to execute the search warrant in military SWAT team fashion, with little or no advance knocking or warning, without due regard for the risk involved, consistent with numerous other executions . . . ." (Am. Compl. ¶ 60). In sum, Plaintiffs allege LMG's "policy or custom results in the . . . execution [of a search warrant] in an unreasonable manner in violation of Plaintiffs' Fourth Amendment rights[, and LMG] . . . is deliberately indifferent to the known or obvious consequences of its true policies and customs." (Am. Compl. ¶¶ 61-62). Notably, Plaintiffs' Amended Complaint does not point to a specific policy, procedure, or custom—outside of generalized conclusory statements—to support these claims, nor does the Amended Complaint contain any exhibits. (Am. Compl.)

Municipalities may be liable for failure to train claims,[7] but "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 822-23 (1985)); *see Tuttle*, 471 U.S. at 822-23 ("[T]he 'policy' [of failing to train] . . . is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). For municipal liability, "a plaintiff 'must establish that:  1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'" *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). The focus "must be on [the] adequacy of the training

---

[7] "[T]he failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (footnote omitted).

program in relation to the tasks the particular officers must perform." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).[8]

The "deliberate indifference" prong requires more than "[a] showing of simple or even heightened negligence . . . ." *Brown*, 520 U.S. at 407. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *Harris*, 489 U.S. at 389. The Sixth Circuit has delineated two situations which demonstrate deliberate indifference for failure to train claims: (1) "[failing]to provide adequate training in light of foreseeable consequences that could result from a lack of instruction"; and (2) "[failing] to act in response to repeated complaints of constitutional violations by its officers." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700-01 (6th Cir. 2006) (internal quotation marks omitted) (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). Thus, the constitutional violation must be a "known or obvious consequence" of LMG's purported lack of training and "requires proof that a municipality's employees engaged in a 'pattern of similar constitutional violations' separate from the conduct that harmed the plaintiff." *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (internal quotation marks omitted) (quoting *Connick*, 563 U.S. at 61-62); *see also Connick*, 563 U.S. at 61 ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (alteration in original) (internal quotation marks omitted) (quoting *Brown*, 520 U.S. at 410)).

---

[8] Though a singular officer may be unsatisfactorily trained, this alone does not establish a policy to establish municipal liability. *Harris*, 489 U.S. at 390-91 (citing *Springfield v. Kibbe*, 480 U.S. 257, 268 (1987) (O'Connor, J., dissenting); *Tuttle*, 471 U.S. at 821). Moreover, it is insufficient "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct[,]" as this may extend to every law enforcement encounter with injury but does "not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.* at 391. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.*

Relatedly, municipal liability is available when "a custom of tolerance or acquiescence of federal rights violations" is maintained by a municipality and results in injury. *Jackson*, 925 F.3d at 828 (internal quotation marks omitted) (quoting *Burgess*, 735 F.3d at 478); *see Monell*, 436 U.S. at 690-91 (noting a government body may be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."). A custom of tolerating or condoning violations of rights "is unwritten but nevertheless entrenched," and a party bringing this claim must show: (1) existence of "a clear and persistent pattern" of illegal activity; (2) actual or constructive notice to the municipality; (3) municipal approval of the unconstitutional conduct, "such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction;" and (4) the custom was the "moving force" to the constitutional violation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe*, 103 F.3d at 508); *see Howse v. Hodous*, 953 F.3d 402, 411 (6th Cir. 2020). "[D]eliberate indifference 'does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious, deliberate indifference' to the alleged violation." *Thomas*, 398 F.3d at 434 (quoting *Doe*, 103 F.3d at 508; *Brown*, 520 U.S. at 407). "[T]he plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference" condoning constitutional violations. *Id.* at 433. *But cf. Griffith*, 975 F.3d at 583 (noting municipal liability may apply for "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation . . . ." (internal quotation marks omitted) (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008))). "Mere blanket assertions that [the municipality] 'tolerated' or

21

'condoned' officer misconduct aren't enough." *Howse*, 953 F.3d at 411 (citing *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016)).

LMG maintains that the *Monell* claim is baseless, as Plaintiffs fail to identify a policy from a person or entity with decision-making authority, to explain how inadequate training caused their alleged injuries, or to show a custom to tolerate, condone, or acquiesce to federal rights violations related to search warrants. (Defs.' Mot. 11). Despite contending that each step of the warrant's execution was reasonable, LMG insists Plaintiffs have presented no evidence of deliberate indifference to prove the failure to train claims. (Defs.' Mot. 12-14). Moreover, LMG classifies Plaintiffs' tolerance and acquiescence arguments as "pure conjecture" given a lack of supporting evidence. (Defs.' Reply Mot. Summ. J. 14, DN 39 [hereinafter Defs.' Reply]). The only materials submitted by Plaintiffs establishing that LMG was aware of alleged constitutional violations relate to two reports after the search in question. (Defs.' Reply 14). Thus, LMG contends it had "no notice of a pattern of unconstitutional acts by its employees because these matters were not known until long after July 2019." (Defs.' Reply 14-15). Thus, the burden shifted to Plaintiffs to present specific facts indicating a genuine issue of a disputed material fact. *See Matsushita*, 475 U.S. at 586-87.

Plaintiffs' response does not address deliberate indifference or a custom by LMG to tolerate, condone, or acquiesce to unreasonable search warrant executions. (Pls.' Resp. 9-16). Instead, Plaintiffs focus on actions taken to obtain the warrant, by alleging deliberate indifference by LMG because officers "routinely obtain search warrants [when they] are not even required to take Metro's Search Warrant Training course and [this practice] puts citizens and officers at undue risk." (Pls.' Resp. 14). Plaintiffs allege LMG maintains a "tolerance and custom of obtaining search warrants without probable cause . . . ." (Pls.' Resp. 16).

22

The Sixth Circuit has rejected claims for municipal liability when plaintiffs "fail[] to show several separate instances of the alleged rights violation." *Thomas*, 398 F.3d at 434. Plaintiffs' Amended Complaint contains no information, aside from conclusory statements, to establish previous violations of knock and announce requirements for executing warrants. Plaintiffs' response fares no better as it focuses on Troutman's efforts to procure the search warrant. Plaintiffs proffer portions of an assessment regarding Louisville Metro Police Department by Hilliard Heintze, but this assessment was not completed until 2021, long after the July 2019 execution of the warrant at issue here. (Pls.' Resp. Defs.' Mot. Summ. J. Ex. K, DN 35-11). Alternatively, Plaintiffs reference an amended complaint from an unrelated civil case, which was filed in December 2020. (Pls.' Resp. Defs.' Mot. Summ. J. Ex. M, DN 35-13 [hereinafter Burr Am. Compl.]); *see also Burr v. Louisville Metro Gov't.*, No. 3:19-cv-00790-DJH-RSE (W.D. Ky.). Again, Plaintiffs have not shown the LMG was aware of these allegations (much less facts showing constitutional violations in executing or obtaining search warrants) when the Residence was searched in July 2019.

Given the collective lack of evidence, Plaintiffs have not demonstrated that LMG officers engaged in a "pattern of similar constitutional violations" of unreasonable search warrant applications or executions separate from Plaintiffs' harm. *Gambrel*, 25 F.4th at 408. Moreover, Plaintiffs have not argued that LMG failed to adequately train the officers in light of foreseeable consequences that could result from a lack of instruction. *See Ellis*, 455 F.3d at 700-01. Thus, Plaintiffs have not satisfied the "deliberate indifference" prong necessary to rebut the shifted burden; therefore, Plaintiffs' failure to train aspect fails. *See id.* This lack of evidence also defeats claims of tolerating, condoning, or acquiescing to federal rights violations, as Plaintiffs "cannot

rely solely on a single instance to infer a policy of deliberate indifference." *Thomas*, 398 F.3d at 433.

Accordingly, Plaintiffs have not demonstrated facts to support the finding of a policy or custom by LMG of allowing constitutional violations similar to those alleged in this case. *See Ellis*, 455 F.3d at 700-01; *Thomas*, 398 F.3d at 433. Therefore, summary judgment in Defendants' favor is proper.

## V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 29) is **GRANTED**, and Plaintiffs' claims are **DISMISSED WITH PREJUDICE**. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

February 28, 2023

cc:     counsel of record